**UNITED STATES of America,**
**Plaintiff,**

v.

**G. A. KINDER, Defendant.**

**Civ. A. No. 690.**

United States District Court

W. D. Arkansas, El Dorado Division.

Dec. 5, 1956.

Chas. W. Atkinson, U. S. Atty., Henry M. Britt, Asst. U. S. Atty., Fort Smith, Ark., for plaintiff.

Robert C. Compton, Melvin E. Mayfield, El Dorado, Ark., for defendant.

JOHN E. MILLER, District Judge.

This case is before the Court on plaintiff's motion for summary judgment. The pleadings, affidavits, and admissions on file disclose the following facts:

On or about March 12, 1947, the defendant, G. A. Kinder, had a discussion with Walter F. Smith, a member of the Community Agricultural Conservation

Committee of the Production and Marketing Administration, U. S. Department of Agriculture, for Union County, Arkansas, and Clinton E. Henson, County Administrative Officer of said County Committee. This discussion took place in front of Mr. Smith's home. Henson and Smith explained to Kinder the cotton crop insurance program then in effect. Kinder asked how much insurance he would have under the program and was informed the coverage would be approximately 75 or 80 percent of his average yield in past years. In this connection, Kinder's affidavit contains the following statements:

"I then asked them how much insurance I would have, and they asked me what my average lint cotton production had been for the past years. I told them I had averaged 255 pounds to the acre, and they had a book or file with them which they turned to and looked up my average yield, and said, 'Yes, that is right, your average is 255 pounds'. They then told me that the insurance would be for either 75% or 80%, I am not sure which figure they named, of my average production. This would have been around 200 pounds per acre. I then told them I would sign the paper they had, with the understanding that I would be insured for the approximate 200 pounds, which represented either 75% or 80% of my average yield.

"At the time I signed this paper it was a blank form with none of the blanks filled in. I did not at that time authorize them to fill in any of the blanks nor did I later authorize anyone to fill in the blanks. I did not apply for any level of insurance, but only applied for insurance to cover the approximate 200 pounds per acre, which represented 75% or 80% of my average yield."

In regard to this matter, Henson's affidavit contains the following statements:

"We explained that we did not have the county actuarial table or listing sheets which, according to the formula prescribed in the regulations, would determine the basis of the coverage and premium rate for Mr. Kinder's farm. I did tell Mr. Kinder that the coverage for C level insurance would be approximately 75 percent of his long time average yield of lint cotton per acre as established by the County ASC Committee and approved by the Federal Crop Insurance Corporation. On the basis of this explanation Mr. Kinder signed the application for cotton crop insurance for the year 1947. There was no possible source of knowledge from which I could have provided him with more detailed information concerning the coverage on his farm since the crop insurance program, as set up in the regulations, does not provide for offering an individual contract to a particular insured with initially determinable and fixed and certain coverage. The coverage in an individual contract must be determined by the Corporation according to a prescribed formula and is not determinable at the time of the making of the application for insurance."

Smith's affidavit contains the following statements:

"We did not have with us the listing sheets or other information to enable us to discuss with Mr. Kinder his exact yield coverage. I do not recall the exact details of the conversation but to the best of my memory we did tell him that his coverage would be approximately 75 percent of his average yield for the period of years that was used in determining the coverage. I have no recollection of discussing with him any amount in pounds of yield. I, of course, had no authority to change any of the regulations governing federal crop insurance contracts. It is my recollection that

Mr. Kinder signed the application for insurance on that date after our discussion with him."

The application which Kinder signed on March 12, 1947, contained the following provisions:

United States Department of Agriculture
Production and Marketing Administration
Federal Crop Insurance Corporation

Name and Address of Applicant:　71–070　　　7–166

Name:　G. A. Kinder　　　(State and County Code and Application number)
　　　(Type or Print)

Address:　Route 1, Smackover,　　Union　　　Arkansas
　　　(Type or Print)　　　　(County)　　　(State)

### Application for Cotton Crop Insurance

(Pursuant to the Federal Crop Insurance Act, as amended)

A. The undersigned applicant hereby applies to the Federal Crop Insurance Corporation (herein called "the Corporation") for insurance to cover his interest as landlord, owner-operator, tenant, or sharecropper in American Upland cotton crops to be planted on all insurance units considered for crop insurance purposes to be located in the county designated above, in which the applicant has an interest at the time of planting. The insurance shall cover loss in yield of lint cotton (and cottonseed production if insured) due to unavoidable causes, including drought, flood, hail, wind, frost, winter-kill, lightning, fire, excessive rain, snow, wildlife, hurricane, tornado, insect infestation, plant disease, and such other unavoidable causes as may be determined by the Board of Directors of the Corporation. It is understood and agreed that this application, when accepted by the Corporation, and the Cotton Crop Insurance Regulations issued by the Corporation including any amendments thereto, shall constitute the insurance contract, and such contract shall be substituted for and take the place of any existing cotton crop insurance contract between the applicant and the Corporation as it relates to future crop years. If this application is accepted by the Corporation, the contract shall be in force and effect for the first crop year beginning after submission of the application and shall continue for each succeeding crop year thereafter until either party gives to the other party, on or before January 31 or the applicable calendar closing date for any year, whichever is later, written notice of termination effective at the beginning of the succeeding crop year. Failure to terminate the contract as herein provided shall constitute acceptance of changes, if any, in the premium rate(s), amount of insurance, insurance coverage or in the Cotton Crop Insurance Regulations. It is further understood and agreed that no terms or conditions of the contract shall be waived or changed except as authorized in writing by a duly authorized officer or representative of the Corporation.

B. For each crop year, the premium rate(s) per acre and the coverage group(s) for each insurance unit covered by the contract shall be those established by the Corporation as shown on the crop insurance listing sheet and shall be on file in the office of the county association.

C. Level of Insurance Applied For:　　C
　　　　　　　(Enter A, B, or C)

D. Cottonseed Production Insured:      No
                               (Enter Yes or No)

E. The grade and staple of cotton to be used for the payment of premiums and indemnities shall be determined by the Corporation for the county or area in which the farm is considered for crop insurance purposes to be located and shall be on file in the office of the County Association.

F. The undersigned applicant further agrees to follow recognized good farming practices, and to properly prepare the land, plant and care for the cotton crop and to submit an acreage report promptly after planting is completed.

G. Note for Premium.—Subject to all terms and conditions of this application, the undersigned applicant promises to pay to the order of the Corporation, each crop year during which the insurance contract is in effect, on or before the applicable maturity date specified in the Cotton Crop Insurance Regulations, the amount of the premium due from him under the contract for such year, either in cash or cotton, or both, with interest after maturity on any unpaid portion thereof at the rate of one-half of one percent for each calendar month or fraction thereof, except that no interest will be charged on any amount that is paid within two calendar months after maturity.

Any unpaid amount of this note (either before or after the maturity date) may be deducted from any indemnity payable under the contract, from the proceeds of any commodity loan to the insured, and from any payment made to the insured under the Soil Conservation and Domestic Allotment Act, as amended, or any other act of Congress or program administered by the United States Department of Agriculture.

The undersigned co-signer, if any, is a surety for the payment of the premium due in the first crop year of the contract and is in no other way a party to the contract.

| March 12, 1947 | /s/ G. A. Kinder |
|---|---|
| (Date) | (Signature of Applicant) |
| | /s/ Walter F. Smith |
| | (Witness to Applicant's Signature) |

(Co-Signer of Premium Note—Name and Address—Type or Print)

H. Recommendation and Certification by the County Committee.—The undersigned member of the County Agricultural Conservation Committee, on behalf of such Committee, recommends acceptance of this application and certifies that, to the best of his knowledge and belief, the application has been submitted in accordance with the provisions of the Cotton Crop Insurance Regulations, and any amendments thereto, and that, if the signature of the applicant in Item G has been affixed by a person who signed as fiduciary or agent, such person had authority to act in such capacity.

| 3/18/47 | /s/ Brutus Harrell |
|---|---|
| (Date) | (Signature of County Committeeman) |

I. Acceptance by the Federal Crop Insurance Corporation.—It is understood and agreed that upon acceptance of the application by a duly authorized representative of the Corporation, as evidenced by his approval below, the insurance contract shall be in effect, provided the

application has been submitted in accordance with the provisions of the application and the Cotton Crop Insurance Regulations, including any amendments thereto.

The Federal Crop Insurance Corporation

4–15–1947                          By   /s/ C. S. Dupree
(Date)

The name and address of the applicant, Kinder, at the top of the application were typewritten. Also the letter "C" in the blank for "Level of Insurance Applied For" was typewritten. Subsequently, the County Committee placed Kinder in coverage group No. 14 and mailed him copies of acreage reports from which he could determine the extent of his insurance coverage. Some time in July, 1947, Kinder learned that he was not insured for 200 pounds of cotton per acre, and he immediately went to talk with Henson. In his affidavit Kinder states that:

> "When I got to El Dorado I told Mr. Henson that this was not the amount of insurance that I had offered to purchase, that it was nowhere near the amount I had offered to purchase, and that I did not want insurance in the amounts set out in the letter; that I was not buying such insurance and that I had not ever asked to buy such insurance. Mr. Henson told me that there wasn't anything he could do about the matter, and he did not treat me with much respect. Whereupon I left his office, after telling him again that I had not ever asked to buy the amount of insurance that they had stated in the letter that I received from the Government."

The premium on the insurance was $222.36. Defendant has made no payments on the premium. In 1947 defendant participated in the agricultural conservation program and became entitled to payment under such program in the amount of $48.72. On March 4, 1948, this sum of $48.72 was set off against the premium on the Federal crop insurance, leaving a principal amount due of $173.64. The accrued interest as of September 1, 1955, was $84.81, and interest has accrued thereafter at the rate of one-half of one percent each calendar month.

Level "C" insurance provided the maximum coverage available for a particular farm or coverage group.

From the foregoing it appears that the following issues of fact exist: (1) whether Smith and Henson informed defendant that the insurance would be 75, or would be 80 percent of his average yield for previous years; (2) whether Smith and Henson informed defendant that his insurance would be approximately 200 pounds per acre; and (3) whether Henson explained to defendant the effect of "C" level insurance. If any one of these issues of fact is material, the Court cannot enter a summary judgment under Rule 56, Fed.Rules Civ.Proc., 28 U.S.C.A.

■ At the outset it should be noted that if the insurance contract was validly executed, defendant's attempted oral cancellation of the insurance in July of 1947 was completely ineffective. This is true for two reasons. First, under Department of Agriculture Regulation, Section 419.4, any cancellation was required to be made in writing. See, United States v. Shaw, D.C.N.D., 137 F.Supp. 24; United States v. Cain, D.C.Okl., 112 F.Supp. 616. Secondly, even a written cancellation would apply only to a succeeding year and would not apply to the current year.

■■ It is also well settled that unauthorized representations of an agent of the Federal Crop Insurance Corporation are invalid and are not binding on the United States. United States v. Feldman, D.C.Neb., 93 F.Supp. 980. Thus, in the instant case, even if Henson and Smith represented to defendant that his insurance would be 75 or 80 percent

of his average yield, which would amount to approximately 200 pounds per acre, this representation would be unauthorized and would not be binding on the United States.

In United States v. Feldman, supra, the court at page 983 of 93 F.Supp., said:

"And even if the defendant's version of the conversation of August 23, 1945 were accepted, it could not serve him as an effective defense to the plaintiff's claim. The representation, attributed to Albracht, to the effect that the defendant's wheat yield would be insured annually to the extent of nineteen bushels per acre was clearly beyond his authority. The system of yield insurance set up in the regulations, from which limited quotations have been made, is not one offering individual contracts to customers with initially determinable and fixed and certain coverage and subject to separate engagement between the corporation and each insured farmer. On the contrary, the basis of coverage is left by the regulation to determination, according to a prescribed formula, by the corporation through its proper representatives, and, at least in the case of an original contract, is not determinable at the time of the making of the application for insurance.

"The defendant knew that he was dealing not with a private insurance corporation but with an agency of the United States government; and, stern as the rule may be, he was bound to know the limitations upon Albracht's authority, and in the event of, and in reliance upon, any excess of that authority may neither fasten responsibility upon the plaintiff nor escape liability which otherwise rests upon him."

It follows that issues of fact Nos. 1 and 2 referred to above are not material, and do not prevent the granting of a summary judgment.

The remaining issue of fact is whether Henson advised defendant of the effect of "C" level insurance. In this connection, defendant contends that he signed a blank application and that he did not request or authorize Henson or Smith to fill in the blank for "Level of Insurance Applied For". Plaintiff further contends that this was an essential part of the insurance contract and that there was no meeting of the minds; thus, no valid contract was entered into between the parties. For purposes of the motion for summary judgment the Court is assuming that defendant's statement in the affidavit that he merely signed a blank form is correct. As a matter of fact, the truth of this statement is shown on the face of the application itself. Most of the blanks in the application were filled in by typewriter, which indicates strongly that said blanks were not filled in until Henson or Smith returned to the office. It is also true that the letter "C" in the blank "Level of Insurance Applied For" was typewritten, which would indicate that it was inserted later by Henson or Smith. This raises the question of whether Henson and Smith had either express or implied authority to fill in the blanks in the application, and particularly to designate the level of insurance as "C". Defendant's affidavit, which the Court accepts as true, establishes that he gave no express authority to Smith or Henson to fill in the blanks. However, it is clear that he gave them implied authority to do so. He signed the application knowing that the blanks would have to be filled in, and by asking for coverage of 200 pounds per acre he made it clear that he wanted the maximum amount. Under these circumstances Henson and Smith had implied authority to fill in the blanks, and more particularly, had implied authority to insert the letter "C" in order to obtain the maximum insurance for defendant.

In this regard, defendant had a duty to read the application. Frier v. Federal Crop Insurance Corporation, 5 Cir., 152 F.2d 149, 150, certiorari denied

328 U.S. 856, 66 S.Ct. 1343, 90 L.Ed. 1628.

If he had done so, he would have been advised of the limitations on the authority of Henson and Smith and would have been advised that the premium rate and coverage of the insurance would be established by the Federal Crop Insurance Corporation. If in fact Henson and Smith misled defendant it is, of course, unfortunate. But that is one of the pitfalls a person faces when he deals with the Government. In another Federal Crop Insurance Corporation case the court in United States v. Blackburn, D.C.E.D.Mo., 109 F.Supp. 319, 321, said:

"In these cases, as in many others in which the Government is involved, cases of hardship are presented. Based upon the information that the defendants were given by representatives of the corporation, they may well have been led to fail to give notice and to give certain information which they were required to give. If the plaintiff were a private insurance company, the matters might present a different issue, but where the Government is a party, the regulations must be strictly complied with. As Mr. Justice Holmes stated in Rock Island, Arkansas & Louisiana R. Co. v. U. S., 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188: 'Men must turn square corners when they deal with the Government. If it attaches even purely formal conditions to its consent to be sued those conditions must be complied with. * * * At all events the words are there in the statute and the regulations, and the Court is of opinion that they mark the conditions of the claimant's right.'"

In view of the above, the Court is of the opinion that the issue of fact concerning the question of "C" level insurance is not a material issue of fact.

The application provided that the premium could be deducted from any payment made to the insured under the Soil Conservation and Domestic Allotment Act, 16 U.S.C.A. § 590a et seq., or any other act of Congress administered by the United States Department of Agriculture. Therefore, plaintiff had the right to set off the sum of $48.72 which was due defendant under the Agricultural Conservation Program.

In summary, the Court is convinced that there is no material issue of fact remaining and that plaintiff is entitled to summary judgment in its favor as a matter of law. Therefore, a judgment should be entered in favor of the plaintiff and against the defendant in the sum of $173.64 principal, plus interest in the sum of $84.81 as of September 1, 1955, plus interest thereafter on the unpaid portion at the rate of one-half of one percent for each calendar month or fraction thereof.